PAMPELL 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN



 




NO. 3-92-121-CV




CAPITAL RISK MANAGEMENT CORPORATION,



 APPELLANT


vs.




PAMPELL INTERESTS, INC., COUNTY MANAGEMENT, INC.,


ZEAL ENERGY CORPORATION, AND ALFRED E. PAMPELL,



 APPELLEES



 




 FROM THE DISTRICT COURT OF FAYETTE COUNTY, 155TH JUDICIAL DISTRICT



NO. 91-031, HONORABLE DAN R. BECK, JUDGE PRESIDING



 





 Capital Risk Management Corporation (hereinafter "Capital Risk") appeals from
an adverse judgment rendered in a declaratory-judgment action it brought against Pampell
Interests, Inc., County Management, Inc., Zeal Energy Corporation, and Alfred E. Pampell,
individually (hereinafter collectively "CMI"). CMI brings cross-points attacking the judgment as
well. We will affirm the judgment of the trial court.



THE CONTROVERSY



A.  Background

 On April 4, 1985, Endrex Exploration Co. (hereinafter "Endrex") and County
Management, Inc. (1) entered into an amended farmout agreement (hereinafter "Agreement"). Under
the terms of the Agreement, CMI granted Endrex the right to drill wells on its lease. The
Agreement defined the parties' rights with regard to "project payout." Endrex would be able to
recoup its costs in drilling and operating the wells. When the costs were recouped, CMI would
have the option of "backing in" to a one-third ownership of the working interest. Under the
Agreement, any credit or refund received by Endrex would reduce the drilling and operating
costs. (2) The Agreement also provided that all debts incurred by Endrex in drilling and operating
the wells under the Agreement would be paid within ninety days.

 Pursuant to the Agreement, Endrex drilled the wells referred to in the Agreement
as the Package 4 Wells. In the process of drilling and operating the wells, Endrex incurred at
least $4,231,791.03 in debts to Halliburton Company and Otis Engineering Corporation
(hereinafter "Halliburton and Otis").

 On March 27, 1986, Endrex filed for Chapter 11 bankruptcy. The bankruptcy
court conducted an adversary proceeding concerning the enforceability of the Agreement. The
bankruptcy judge ruled that the Agreement was an enforceable contract between CMI and Endrex
and that it controlled the rights and obligations of the parties. The amended final judgment from
the bankruptcy proceeding held that Halliburton and Otis were owed valid debts of $4,231,791.03
incurred by Endrex in connection with the Package 4 Wells.

 Endrex submitted its plan of reorganization on May 12, 1989. At that time, Endrex
offered the Package 4 Wells for sale to the highest bidder. The plan of reorganization was
approved by the bankruptcy judge on August 5, 1989. Pursuant to the judge's order, the Package
4 Wells were transferred from the Endrex bankruptcy estate to the Endrex Secured Creditors'
Trust A.

 Capital Risk became interested in purchasing the Package 4 Wells in September
1989. Capital Risk reviewed title opinions, testimony at the adversary proceeding, and the report
by the auditor appointed by the bankruptcy court, all of which indicated that the Package 4 Wells
would never reach payout. (3) After this review, Capital Risk made a bid on the wells in January
1990. The trustee of Secured Creditors' Trust A accepted this bid. A purchase and sale
agreement between the trustee and Capital Risk was executed on February 20, 1990. On March
9, 1990, Secured Creditors' Trust A filed with the bankruptcy court a motion to sell the Package
4 Wells free and clear of liens, claims, and encumbrances for the contract price of $925,000. The
bankruptcy court held a hearing on the motion on April 13, 1990, and signed an order approving
the sale on May 3, 1990. Thus, on May 3, 1990, Capital Risk acquired all of the interest of
Endrex in the Package 4 Wells. As a result of the sale, Halliburton and Otis voluntarily accepted
this partial payment in full satisfaction of their claims of over four million dollars. 

 Thereafter, CMI informed Capital Risk by letter dated May 23, 1990, that it was
taking the position that "project payout" under the terms of the Agreement had occurred and that
it was exercising its option to acquire a one-third "back-in" ownership interest in the Package 4
Wells. CMI then notified purchasers of oil and gas from the Package 4 Wells of its asserted one-third interest in the proceeds and requested that these purchasers hold back sufficient revenues to
pay CMI one-third of the proceeds.



B.  Procedural History

 Capital Risk filed suit seeking a declaratory judgment regarding the payout
provisions of the Agreement. It contended that the provisions were unambiguous and that payout
would occur when, as a successor-in-interest to Endrex, it had recouped all of the drilling and
operating costs paid or incurred by Endrex from the net revenues received from the sale of oil and
gas. In the alternative, Capital Risk claimed that CMI was barred from asserting a contrary
position by the doctrines of res judicata, collateral estoppel, equitable estoppel, and waiver.

 CMI, on the other hand, took the position that the payout provision in the
Agreement meant that only those costs actually paid by Endrex, or those for which there was

a legal liability for payment, could be recouped. This meant that when the remaining debts were
discharged by the bankruptcy court, payout occurred and CMI was entitled to its back-in
ownership interest at that moment. 

 The trial in this cause took place in several hearings before the court. A hearing
on the meaning of the payout provisions was held on April 29, 1991, (4) and a hearing on the
alternative arguments made by Capital Risk was held on January 23, 1992. On May 29, 1991,
the trial court issued a letter opinion to the parties regarding its decision on the meaning of
payout. (5) Final judgment was rendered on January 23, 1992. 

 In its final judgment, the trial court held that Capital Risk was entitled to recover
its costs of buying the Package 4 Wells from Secured Creditors' Trust A including: "(i) the
acquisition costs, (ii) the acquisition purchase price, (iii) attorney's and other professional fees and
expenses incurred in connection with the present controversy by Capital Risk, (iv) Phillips'
attorney's fees in the amount of $4,500.00, and (v) Koch's attorney's fees in the amount of
$10,000.00 (Phillips and Koch are to assume the balance of whatever attorney's fees are
incurred)." (6) The judgment recited that the amount of recoverable costs actually expended by
Capital Risk as of August 31, 1991, was $1,408,149.73, of which only $216,488.94 remained
unrecouped at that date. The judgment further recited that when the remaining $216,488.94 was
recouped, payout would occur and CMI would be entitled to a one-third working interest in the
wells.



C.  Contentions on Appeal

 Capital Risk appeals this judgment. In its first point of error, it contends that the
trial court erred in not filing findings of fact and conclusions of law. Capital Risk next contends
that the trial court erred in its construction of the contract. In its final two points of error, Capital
Risk contends that CMI is barred by res judicata, collateral estoppel, and equitable estoppel from
asserting its position regarding construction of the contract. 

 CMI contends by cross-point that the trial court had no basis for allowing Capital
Risk to recoup its acquisition costs including its attorney's fees. CMI also contends by cross-point
that the trial court erred in not finding that payout occurred at the time that the interest was sold
free and clear of all encumbrances to Capital Risk by Secured Creditors' Trust A. In its final two
cross-points, CMI contends that Capital Risk breached the Agreement and seeks recovery of
CMI's attorney's fees.



DISCUSSION


A.  Lack of Findings of Fact and Conclusions of Law 

 Capital Risk's first point of error complains of the failure by the trial court to make
findings of fact and conclusions of law. The company asserts in its brief that "Capital Risk timely
filed a request for findings of fact and conclusions of law and the notice of past due findings." 
Tex. R. Civ. P. 296, 297. A review of the transcript reveals that both parties made timely
requests for findings under rule 296, but that neither party ever filed a notice of past due findings
as is required by rule 297. Capital Risk's failure to follow the requirements of rule 297 results
in a waiver of its complaint that the trial court erred in not filing findings of fact and conclusions
of law. Las Vegas Pecan & Cattle Co. v. Zavala County, 682 S.W.2d 254, 255-56 (Tex. 1984). 
Accordingly, we overrule Capital Risk's first point of error.

 As a result of the above waiver, this appeal is from a bench trial in which there are
no findings of fact or conclusions of law. Thus, we must affirm the judgment of the trial court
if it can be upheld on any legal theory that finds support in the evidence. In re W.E.R., 669
S.W.2d 716, 717 (Tex. 1984). "[I]n the absence of findings and conclusions, the judgment of the
trial court implies all necessary fact findings in support of the judgment." Id.; Buchanan v. Byrd,
519 S.W.2d 841, 842 (Tex. 1975).



B.  Construction of the Contract

 Capital Risk's second point of error contends that the trial court erred in construing
the payout provisions of the Agreement, because it failed to apply basic contract construction
principles and because it rewrote the contract instead of construing it as written.

Both CMI and Capital Risk agree that the central question in this appeal is the proper legal
construction of the language of the Agreement related to the cost side of payout. More
specifically, this Court is called upon to determine the proper construction of the words "paid or
incurred." Both parties also agree that the contract is unambiguous and that we are to give effect
to the objective intent of the parties as expressed in the contract. See Westwind Exploration, Inc.
v. Homestate Sav. Ass'n, 696 S.W.2d 378, 382 (Tex. 1985).

 In construing a contract, the goal of the court is to give effect to the intention of
the parties. Jim Walter Homes, Inc. v. Scheunemann, 668 S.W.2d 324, 330 (Tex. 1984). The
language in the contract should be given its plain grammatical meaning unless it definitely appears
that the intention of the parties would thereby be defeated. Reilly v. Rangers Management, Inc.,
727 S.W.2d 527, 529 (Tex. 1987). The court should examine and consider the whole contract
in its effort to determine the intent of the parties. Coker v. Coker, 650 S.W.2d 391, 393 (Tex.
1983). The question is not what the parties meant to say, but the meaning of what they did say
by the use of the words contained in the agreement. See State Nat'l Bank v. Morgan, 143 S.W.2d
757 (Tex. 1940).

 In the Agreement, "payout" is defined on a well-by-well basis as the point when
net proceeds from the sale of oil and gas of the well equal the total cost of the well. "Total cost"
is further defined, in part, as the sum of operating costs and drilling costs. The Agreement states
that the operating costs included in total cost are those "paid or incurred by Endrex prior to the
date of payout." (Emphasis added). Drilling costs include those "paid or incurred by Endrex for
drilling, testing, completing and equipping such well for production." (Emphasis added).

 Capital Risk asserts that the plain grammatical meaning of the phrase "paid or
incurred" was ignored by the trial court and must be given effect by this Court. Capital Risk
contends that Endrex incurred all of these costs prior to bankruptcy, and Capital Risk must be
allowed to recoup the full amount of the incurred costs before payout will occur under the terms
of the Agreement. Capital Risk insists that since Endrex was actually liable for these debts prior
to bankruptcy, all of the costs were "incurred" within the meaning of the contract, regardless of
what later happened to the corresponding liability of Endrex. 

 On the other hand, in its first two cross-points, CMI asserts that the bankruptcy
court's order effectively resulted in a discharge of all costs incurred by Endrex that remained
unpaid. CMI contends that when the bankruptcy discharge occurred, payout was achieved and
CMI was immediately entitled to its one-third ownership interest under the Agreement.

 Both parties, to some extent, argue that the trial court has rewritten rather than
construed the contract for the parties. We disagree. The crux of this contract dispute concerns
the interpretation of the term "incurred costs" contained in the payout provisions. The goal of the
trial court in interpreting a written contract is to discern the actual intent of the parties as
expressed in the contract. Reilly, 727 S.W.2d at 529; Coker, 650 S.W.2d at 393. "Courts will
avoid when possible and proper a [contract] construction which is unreasonable, inequitable, and
oppressive." Reilly, 727 S.W.2d at 530. The record indicates that the trial judge partially
rejected the extreme positions taken by both parties. For example, it is obvious that the trial court
refused to hold, as Capital Risk contends, that the parties contemplated that the term "incurred
costs" contained in the payout provision did not require a corresponding liability. To construe
the contract otherwise would allow one party to the Agreement to incur unreasonable expenses
with the understanding that they would never have to actually be paid. This would mean, in
effect, that one party could deprive the other of the right to ever "back-in" to an ownership
interest. On the opposite end of the spectrum, the trial court refused to give CMI a windfall
because the creditors in the bankruptcy gave a full release of liens, without considering the sale
price and acquisition costs of the resulting transfer and release.

 In the final analysis, the trial court has interpreted the term "incurred costs"
pursuant to the Agreement to equal the sales price plus acquisition costs and attorney's fees and
established this sum for recoupment by Capital Risk before payout to CMI would occur. It
appears to us that, rather than rewrite the contract for the parties, the trial court has interpreted
the legal meaning of "incurred costs" within the context of the entire Agreement. (7) We conclude
that this interpretation by the trial court was not unreasonable and avoids inequity or oppression
to either party. We, therefore, overrule Capital Risk's second point of error and CMI's first two
cross-points of error. Because of our disposition of CMI's first two cross-points, we do not reach
its remaining two cross-points.



C.  Res Judicata and Collateral Estoppel

 In its third point of error, Capital Risk asserts that the trial court erred in not ruling
that CMI was barred by res judicata and collateral estoppel from asserting its construction of
"project payout." Capital Risk bases its argument on the judgment in the bankruptcy adversary
proceeding. It claims that since the Agreement was the subject matter in the bankruptcy
proceeding, CMI could have, and should have, asked the bankruptcy court to construe the payout
provisions in the Agreement.

 Because the earlier judgment was rendered in federal court, we will apply
substantive federal law concerning res judicata and collateral estoppel. Hayes v. Pin Oak
Petroleum, Inc., 798 S.W.2d 668, 671 (Tex. App.--Austin 1990, writ denied). Res judicata, or
claim preclusion, bars a party from bringing another action on claims actually litigated or claims
that could have been litigated. Jeanes v. Henderson, 688 S.W.2d 100, 103 (Tex. 1985). The
prior judgment operates as an absolute bar to retrial of claims relating to the same cause of action
between the same parties or those in privity with them, involving the same issues, subject matter,
and relief. Bonniwell v. Beech Aircraft Corp., 663 S.W.2d 816, 818 (Tex. 1984). The elements
of the federal doctrine of res judicata include: "(1) identical parties in both suits; (2) prior
judgments rendered by a court of competent jurisdiction; (3) a final judgment on the merits; and
(4) the same cause of action involved in both cases." Hayes, 798 S.W.2d at 672. The federal
doctrine of collateral estoppel, or issue preclusion, provides that "once an issue is actually and
necessarily determined by a court of competent jurisdiction, that determination is conclusive in
subsequent suits based on a different cause of action . . . ." Id. at 671.

 For the purposes of our discussion, we will assume that Capital Risk, as a successor
to Endrex, was a party to the prior bankruptcy proceeding. CMI also participated in that
proceeding. Thus, if the payout provisions in the Agreement had been construed by the
bankruptcy court in the context of the sale of the Package 4 Wells free and clear from
encumbrances, then that judgment would bar the current action. However, that issue was not
addressed by the bankruptcy court, and indeed could not have been so addressed. At the time of
the bankruptcy proceeding, the Package 4 Wells were an asset of Endrex. They had not yet been
sold free and clear of encumbrances. Any decision regarding the status of "project payout" would
have been advisory at that point. We, therefore, overrule Capital Risk's third point of error.



D.  Equitable Estoppel

 With its final point of error, Capital Risk contends that the trial court erred in not
holding that CMI was equitably estopped from asserting its construction of the payout provisions
in the contract. Capital Risk argues that CMI planned to assert that payout occurred upon a sale
from the bankruptcy court prior to the sale. Capital Risk further argues that CMI did not fully
inform potential buyers of its belief that payout would occur upon a sale of the Package 4 Wells
free from liens and encumbrances, even after undertaking a duty of disclosure.

 Estoppel is a rule of equity applied to prevent a person from taking advantage of
a situation when, with knowledge of relevant facts, the person induces or allows another person
to worsen its position. Koelzer v. Pizzirani, 718 S.W.2d 420, 423 (Tex. App.--Fort Worth 1986,
no writ). Equitable estoppel prevents a party from asserting an otherwise valid right when that
party: (1) makes a false representation or conceals material facts; (2) with knowledge, actual or
constructive, of the facts; (3) to a party without knowledge or means of knowledge of the real
facts; (4) with the intention that it should have been acted upon; and (5) the party to whom it was
made has relied upon or acted upon the representation or concealment to its prejudice. 
Gulbenkian v. Penn, 252 S.W.2d 929, 932 (Tex. 1952). "The granting or denial of equitable
relief lies within the sound discretion of the trial court . . . . [A] challenge of the trial court's
refusal to grant . . . equitable relief . . . must be founded on a clear abuse of discretion on the
part of the trial judge." Mathews v. First Citizens Bank, 374 S.W.2d 794, 797 (Tex. Civ.
App.--Dallas 1963, writ ref'd n.r.e.); cf. Fleetwood v. Med Ctr. Bank, 786 S.W.2d 550, 556-57
(Tex. App.--Austin 1990, writ denied).

 As in Mathews, we do not find it necessary or desirable to review the circumstances
under which Capital Risk's alleged claim of equitable estoppel might arise. It is enough to say
that the evidence in this record is in conflict. It is unclear whether CMI actually undertook a duty
of "full disclosure," and in fact there is some evidence that the president of Capital Risk believed
that CMI owed no such duty. There is certainly not enough evidence in the record to indicate that
the trial court abused its discretion in its implied finding that CMI was not equitably estopped
from asserting its construction of the payout provisions. We, therefore, overrule Capital Risk's
fourth and final point of error.



CONCLUSION


 For the reasons stated above, we affirm the judgment of the trial court.



 

 Mack Kidd, Justice

[Before Justices Powers, Kidd and B. A. Smith]

Affirmed

Filed: June 30, 1993

[Do Not Publish]

1.   The relationship between County Management Inc., Pampell Interests, Inc., Zeal
Energy Corp., and Alfred E. Pampell, individually, is unclear. It is apparent from the
record that interests belonging to County Management, Inc. are coextensive with those of
Alfred E. Pampell.
2.   For example, any credit or refund that Endrex received for payment of excess windfall
profit taxes "shall be applied to reduce the taxes actually paid in determining payout."
3.   There were insufficient oil reserves to generate the proceeds needed to pay over four
million dollars in outstanding debts. 
4.   This Court does not have the statement of facts from this hearing because the court
reporter lost his notes.
5.   This letter opinion is not a substitute for findings of fact and conclusions of law, which
were not filed in this case. We are not entitled to look to comments contained within this
letter as such a substitute. See In re of W.E.R., 669 S.W.2d 716 (Tex. 1984). The letter,
however, provides insight into the reasoning the trial court used in reaching its judgment.
6.   Koch Oil & Gas Company and Phillips 66 Natural Gas Company were the first
purchasers of oil and gas from the Package 4 Wells.
7.   We note, for example, that other portions of the Agreement provide that any credits,
discounts, or refunds received by Endrex would inure to the benefit of CMI and would
correspondingly reduce "incurred costs."